NOT DESIGNATED FOR PUBLICATION

No. 113,922

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

MARY JO BRADSHAW, for the Wrongful Death of LEWIS J. BRADSHAW,
Deceased; and STEPHEN L. BRADSHAW, as Special Administrator
for the Estate of LEWIS J. BRADSHAW, for his Survival Claim,
*Appellants*,

v.

MONTEE JEAN SMITH and
HY GRADE CONSTRUCTION & MATERIALS, INC.,
*Appellees*.

MEMORANDUM OPINION

Appeal from Neosho District Court; DARYL D. AHLQUIST, judge. Opinion filed August 19, 2016.
Affirmed.

*Fred Spigarelli*, of The Spigarelli Law Firm, of Pittsburg, for appellants.

*Craig C. Blumreich* and *Joel W. Riggs*, of Larson & Blumreich Chartered, of Topeka, for
appellees.

Before GREEN, P.J., MCANANY and ATCHESON, JJ.

*Per Curiam*: Lewis J. Bradshaw regularly cleaned up 500 acres of undeveloped
land in Neosho County that included a pecan orchard and pastures. He died in the orchard
when an explosive device of the sort used to demolish buildings went off. Bradshaw's
widow and his estate brought a wrongful death action in district court against Hy Grade
Construction & Materials, Inc., which owned the land, and Montee Jean Smith, the
corporation's president. How the device came to be on the property remains an unsolved

1

mystery. Tort law governing the liability of landowners doesn't really abide lingering mysteries of that sort. The district court granted summary judgment to Hy Grade and Smith. Bradshaw's legal representatives have appealed. Looking at the facts presented on summary judgment in the best light for Bradshaw, as we must, we find no breach of the landowner's duty of reasonable care and no evidence the landowner engaged in an abnormally dangerous activity. We, therefore, affirm.

FACTUAL AND PROCEDURAL HISTORY

By way of explaining the tragic circumstances of Bradshaw's death in 2008, we first identify the principal participants and explain their relationships to each other. For convenience, we dispense with repeated references to Bradshaw's legal representatives, the formal plaintiffs, and instead refer simply to Bradshaw. Likewise, we need not draw any precise legal distinction between Hy Grade and Smith as defendants, since their interests are aligned in light of the issues.

We start with Hy Grade. George Burkhart founded the company over 60 years ago. For most of its corporate existence, Hy Grade primarily furnished gravel and concrete for construction projects, and it owned a gravel pit. Hy Grade later purchased a rock quarry from Harry Byers & Sons, Inc., and continued the quarrying operation in that company name. In the district court, Hy Grade pointed out that the quarry remained a separate corporate entity. Given our disposition of the case, the formal corporate relationship of the enterprises while under Burkhart's direction is immaterial. Hy Grade separately acquired the 500-acre tract that includes the pecan orchard.

Smith is Burkhart's daughter. After Burkhart died in 2001, Hy Grade sold the quarry and otherwise phased out of the construction industry. Hy Grade retained only the 500 acres, and its business activities consisted of leasing some of the land as pasture and harvesting the pecans for sale. Upon her father's death, Smith acquired a substantial

2

ownership interest in Hy Grade and became the company's president. At the time of the explosion, Hy Grade paid only Smith, Bradshaw, and a part-time bookkeeper.

Bradshaw, who was 72 years old when he died, worked for Hy Grade either full-time or part-time for most of his adult life. He had a full-time position at the gravel pit and later the rock quarry that included supervising excavation, maintaining equipment, and blasting. Hy Grade regularly used explosives in excavating rock from the quarry, a point we return to later. Apart from those duties, Bradshaw had an entirely separate, part-time job with Hy Grade as caretaker for the 500-acre tract. In that role, Bradshaw mowed and cleared brush as necessary and otherwise saw to the general upkeep of the land.

After Hy Grade sold the quarry, Bradshaw continued to work there for the new owner—a job he held until his death. He also kept his part-time job with Hy Grade as the groundskeeper of the pecan orchard and the surrounding land. At least in the time leading up to his death, Bradshaw set his own schedule in attending to the land and typically put in time there on Fridays and Saturdays. For summary judgment purposes, everyone has treated Bradshaw as an independent contractor in his capacity as groundskeeper.

On Saturday afternoon November 8, 2008, Bradshaw had been clearing brush and burning it. Something exploded. Bradshaw, though seriously injured, contacted his wife on his cell phone. She knew that he was working in the pecan orchard, so she and several neighbors were able to find him there. They immediately called the authorities. First responders arrived quickly. Bradshaw had severe injuries to one arm and to his head. He was first transported to an area hospital and finally to a larger, regional hospital. Bradshaw died the next day.

The Neosho County Sheriff's Department and the State Fire Marshall's office investigated the explosion. In a pole barn on the land, investigators found half a dozen empty boxes for Dyno Nobel, a commercial explosive containing Unigel as its active

3

ingredient. The product is commonly used to blast rock for quarrying. The investigators also found spent or used sections of plastic shock tube typically used with that kind of explosive. They later found more spent tubing in Bradshaw's pickup, which a family member had driven from the scene of the explosion.

A man who lived near the pecan orchard told investigators he had never heard explosions on the property. He said Bradshaw used the spent plastic tubing to mark trees that needed to be cleared. Investigators found plastic tubing wrapped around a number of logs on the property.

A Fire Marshall's investigator found parts of a linear shaped charge, commonly known as an LSC, at the explosion site. The pieces contained the explosive PETN. LSCs are typically used in the demolition of buildings and other structures. The investigators concluded the heat from the bonfire caused the LSC to explode and fatally injure Bradshaw. They were unable to determine where the LSC came from or how it wound up on Hy Grade's land. They also could not tell whether Bradshaw inadvertently placed the LSC in the bonfire along with the brush he had cleared or whether he simply had started the fire on or near the charge.

In a deposition, Bradshaw's wife testified that she had never known Bradshaw or anyone else to use explosives on the 500-acre tract. She said Bradshaw never talked about taking explosives to the property or using them apart from his work at the quarry. Smith testified that she knew explosives were used in the quarrying operation, but she had no knowledge that her father, Bradshaw, or anyone else ever used live explosives on the 500-acre tract. Smith also testified she was unaware of what was stored in the pole barn, including the empty Dyno Nobel boxes. The man who purchased the rock quarry from Hy Grade and continued to run that operation testified the company never purchased or used LSCs.

In their suit filed in late 2010, Bradshaw's representatives advanced two theories of liability against Hy Grade and Smith: (1) the company and Smith, as its principal shareholder and president, breached the duty of care landowners owe persons they permit on their property; and (2) the company engaged in an abnormally dangerous activity by having explosives on the premises. The first theory is one of negligence, and the second strict liability. After the parties concluded discovery, Hy Grade and Smith filed for summary judgment. Bradshaw duly responded. The district court filed an 18-page memorandum decision in May 2015 granting judgment to Hy Grade and Smith. Bradshaw has timely appealed.

LEGAL ANALYSIS

The standard of review for summary judgment is well settled. A party seeking summary judgment has the obligation to show, based on appropriate evidentiary materials, there are no disputed issues of material fact and judgment may, therefore, be entered in its favor as a matter of law. *Shamberg, Johnson & Bergman, Chtd. v. Oliver*, 289 Kan. 891, 900, 220 P.3d 333 (2009); *Korytkowski v. City of Ottawa*, 283 Kan. 122, Syl. ¶ 1, 152 P.3d 53 (2007). In essence, the movant argues there is nothing for a jury or a trial judge sitting as factfinder to decide that would make any difference. The party opposing summary judgment must then point to evidence calling into question a material factual representation made in support of the motion. *Shamberg*, 289 Kan. at 900; *Korytkowski*, 283 Kan. 122, Syl. ¶ 1. If the opposing party does so, the motion should be denied so a factfinder may resolve that dispute. In addressing a request for summary judgment, the district court must view the evidence in the light most favorable to the party opposing the motion and give that party the benefit of every reasonable inference that might be drawn from the evidentiary record. *Shamberg*, 289 Kan. at 900; *Korytkowski*, 283 Kan. 122, Syl. ¶ 1. An appellate court applies the same standards in reviewing the entry of a summary judgment. The Kansas Supreme Court recently

5

reiterated those precepts in *Fawcett v. Oil Producers, Inc. of Kansas*, 302 Kan. 350, 358-59, 352 P.3d 1032 (2015).

*Bradshaw's Negligence Claim*

As a general legal proposition, a landowner owes a duty of reasonable care under the circumstances to invitees and licensees. *Wrinkle v. Norman*, 297 Kan. 420, 422, 301 P.3d 312 (2013). That principle guides Bradshaw's negligence claim against Hy Grade and Smith. To avert summary judgment, Bradshaw has to point to evidence that they did something a reasonable landowner would not do or failed to take an action that a reasonable landowner would have taken. In some circumstances, landowners have a duty to inspect their premises for possible hazards. In other words, the duty of care entails reasonable inspection. This is particularly true of businesses open to the public. See *Elrod v. Walls, Inc.*, 205 Kan. 808, 811-12, 473 P.2d 12 (1970) (proprietor of grocery store displaying open produce had duty to take reasonable steps to keep aisles free of debris that might cause patron to slip and fall). A landowner, however, is not the insurer of a patron's safety. *Elrod*, 205 Kan. at 812. And a landowner has no duty to warn or otherwise protect against known or obvious dangers. *Wellhausen v. University of Kansas*, 40 Kan. App. 2d 102, 105-06, 189 P.3d 1181 (2008).

Bradshaw contends Hy Grade, acting through Smith, had a duty to inspect the 500-acre tract for hazards such as the LSC. Moreover, according to Bradshaw, had Smith looked in the pole barn, the empty Dyno Nobel boxes there would have imposed a more particularized duty to then search for explosives on the land. We disagree with those propositions.

Whether a legal duty exists is, itself, a question of law for the court rather than a fact issue for the jury. *Berry v. National Medical Services, Inc.*, 292 Kan. 917, 920, 257 P.3d 287 (2011). In *Berry*, the court explained that a legal duty supporting a negligence

6

claim requires that "the probability of harm must be foreseeable." 292 Kan. at 920. Similarly, the court has said that "the duty of care is intertwined with the foreseeability of harm." *Shirley v. Glass*, 297 Kan. 888, 900, 308 P.3d 1 (2013). Thus, the supermarket with an open produce area has a duty to regularly inspect for fruit or vegetables that have fallen to the floor and might cause shoppers to lose their balance. See *Elrod*, 205 Kan. at 811-12. That is a foreseeable harm in those circumstances.

Bradshaw, however, has directed us to no case authority recognizing an owner's duty to routinely inspect undeveloped land used for agricultural purposes, such as growing pecans, or ranching purposes, such as pasturing cattle. Unlike a retail enterprise, the land is not held open to the general public to come and go during set hours to browse and buy. Nor is it like a service business, say a physician's office or an accounting firm, where people regularly partake of those services, typically with scheduled appointments. And vendors may make deliveries and pickups to both kinds of businesses. To the contrary, farmland and cattle pastures are not held out to the public, so someone entering the premises simply because he or she can would be an interloper. Here, of course, Bradshaw was not an interloper but an invitee. Nonetheless, Bradshaw has offered no persuasive or controlling precedent supporting a duty owed invitees of the kind he would ascribe to Hy Grade and Smith.

Absent some directly applicable law, we are disinclined to find a general obligation to inspect to be part of the duty reasonably owed under the circumstances. We doubt someone owning 100,000 acres of open land used for farming or left entirely unused has some obligation to routinely inspect each and every acre for conditions that might pose potential hazards to invitees or interlopers.

Our observation does not, however, extend a form of common-law immunity to those landowners. For example, by statute, livestock may not "run at large" in Kansas, K.S.A. 2015 Supp. 47-122, and the owner of the animals will be liable for any injury they

7

cause, K.S.A. 47-123. So pastureland is commonly fenced. And there is a concomitant duty to make at least some periodic visual inspection to determine that the fencing appears to be intact. See *Jewett v. Miller*, 46 Kan. App. 2d 346, 351, 263 P.3d 188 (2011). But no comparable particularized duty arises by statute or common law to guard against the abstract and exceedingly unlikely possibility that an explosive device might wind up somewhere on a large expanse of open land. See *Jones v. Hansen*, 254 Kan. 499, 509-10, 867 P.2d 303 (1994) (duty of reasonable care occupier of land owes privileged entrant includes foreseeability of harm). Without a legal duty, there can be no tort liability. *Irvin v. Smith*, 272 Kan. 112, 122, 31 P.3d 934 (2001); *Gooch v. Bethel A.M.E. Church*, 246 Kan. 663, 680, 792 P.2d 993 (1990).

Even if we assume Smith knew or should have known of the empty Dyno Nobel boxes, we don't see that as a circumstance imposing an enhanced duty of inspection. The boxes were, after all, empty. Their presence on the premises doesn't give rise to reasonable inferences that, first, they contained explosives when they were brought on to the property and, then, that the contents were used there or, more specific to Bradshaw's theory of the case, that at least some live explosives remained somewhere on the 500-acre tract. The theory necessarily relies on impermissible inference stacking and, thus, speculation rather than competent evidence. The ultimate inference depends entirely on the accuracy of the precedent inference and is itself without any direct or circumstantial support in the evidentiary record. See *State v. Rice*, 261 Kan. 567, 586, 932 P.2d 981 (1997) ("'Presumption and inferences may be drawn only from facts established, and presumption may not rest on presumption or inference on inference.'") (quoting *State v. Doyle*, 201 Kan. 469, 488, 441 P.2d 846 [1968]); *In re Estate of Rickabaugh*, 51 Kan. App. 2d 902, 910, 358 P.3d 859 (2015), *rev. granted* 303 Kan. ___ (2016); *State v. Gordon*, No. 105,845, 2012 WL 2620554, at *2 (Kan. App. 2012) (unpublished opinion) ("A reasonable inference may be properly drawn from a fact supported in the evidence. But another, more remote inference may not then be based on that inference alone."), *rev. denied* 297 Kan. 1250 (2013). Indeed, all of the summary judgment evidence supports

8

just the opposite conclusion—that explosives were neither used nor kept on the land. Although the evidence on the point is essentially circumstantial, it remains uncontroverted. Nobody saw or heard explosives being used on the 500-acre tract or recalled Bradshaw or anyone else saying explosives were ever used there.

In short, the empty boxes are simply empty boxes. And sturdy boxes are often repurposed, so their actual contents have nothing to do with their labels. The circumstances here do not create a disputed issue of material fact or a jury question.

Even if we were to indulge the inferences Bradshaw advances, the theory of liability still fails to establish actionable negligence on the part of Hy Grade or Smith. Assuming Smith had a legal duty to inspect for explosives, a reasonable inspection of the property presumably would discover any recognizable explosives and would miss any latent or hidden explosives. Absent any inspection by Smith, a recognizable explosive would constitute a known and obvious danger or hazard to Bradshaw. Conversely, a hidden explosive would remain so whether or not an inspection were done. Either way, the failure to inspect could not have been the proximate cause of the fatal injury given the undisputed facts. See *Siruta v. Siruta*, 301 Kan. 757, 767, 348 P.3d 549 (2015) (causation may be resolved on summary judgment if undisputed facts could support no reasonable inference of proximate cause); *Hale v. Brown*, 287 Kan. 320, 324, 197 P.3d 438 (2008).

Hy Grade and Smith have suggested Bradshaw must have brought the LSC on to the property. But that supposition, like Bradshaw's negligence theory, has no anchor in the evidence. The rock quarry where Bradshaw worked didn't use LSCs. And he had no reason to acquire an LSC or to bring it to the 500-acre tract. Again, all of the summary judgment evidence runs counter to the implication.

The LSC got there somehow. But the record evidence supports no concrete explanation—only legally empty hypotheses. Neither the presence of the LSC nor

9

knowledge of it may be attributed to any party. The district court properly granted summary judgment to Hy Grade and Smith on Bradshaw's negligence theory.

*Bradshaw's Strict Liability Claim*

Bradshaw alternatively argued that Hy Grade and Smith engaged in an abnormally dangerous activity on the 500-acre tract and, therefore, should be held strictly liable for the explosion and its fatal consequences. Kansas has recognized that a party "'who carries on an abnormally dangerous activity'" must act with the "'utmost care to prevent . . . harm'" and will face "'strict liability'" for injuries resulting from the kind of harm rendering the activity dangerous. *Eastman v. Coffeyville Resources Refining & Marketing*, 295 Kan. 470, 474, 284 P.3d 1049 (2012). In *Eastman*, the court repeated its endorsement of the strict liability principles outlined in the Restatement Second of Torts §§ 519 and 520 (1976). 295 Kan. at 474; see also *Williams v. Amoco Production Co.*, 241 Kan. 102, 114-15, 734 P.2d 1113 (1987) (recognizing Restatement principles of strict liability). The courts determine whether a particular undertaking is an abnormally dangerous activity as a matter of law based on the undisputed facts presented on summary judgment or the historical facts found by a jury. *Pullen v. West*, 278 Kan. 183, 190-91, 92 P.3d 584 (2004).

Here, the evidence shows that Hy Grade cultivated and harvested pecans and leased land for pasturing cattle. Neither of those is even arguably an abnormally dangerous activity. We don't understand Bradshaw to contend otherwise. As we have already indicated, the evidence likewise fails to show that Hy Grade used explosives for any reason on the 500-acre tract. Hy Grade and Smith, then, did not carry on an abnormally dangerous activity on the land—assuming the regular use or storage of explosives there would be such an activity. See *Indiana Harbor Belt R. Co. v. American Cyanamid Co.*, 916 F.2d 1174, 1177 (7th Cir. 1990) (noting "the use of dynamite and other explosives for demolition in residential or urban areas" constitutes the "largest class

10

of cases" recognized to involve an abnormally dangerous activity). Compare *Bridges v. Kentucky Stone Co., Inc.*, 425 N.E.2d 125, 126-27 (Ind. 1981) (storage of dynamite not abnormally dangerous activity per se). The unexplained appearance of a single LSC on the land does not amount to an activity attributable to Hy Grade and Smith. They cannot, therefore, be held strictly liable to Bradshaw for the explosion. The district court properly granted summary judgment on that theory.

Affirmed.