IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 120,611

L. RUTH FAWCETT TRUST, CINDY K. PAGE-COLMER, TRUSTEE,
on Behalf of Itself and All Others Similarly Situated,
*Appellants/Cross-Appellees*,

v.

OIL PRODUCERS INC. OF KANSAS,
*Appellee/Cross-Appellant*.

SYLLABUS BY THE COURT

1.

Under Kansas law, all gas leases impose an implied duty on well operators to market any minerals produced. To satisfy this duty, the operator must market its production at reasonable terms within a reasonable time following production.

2.

A corollary of the duty to market is the marketable condition rule, which requires well operators to make gas marketable at their own expense, meaning that they cannot deduct the expenses to make gas marketable from royalty payments to the landowners.

3.

In *Fawcett v. Oil Producers, Inc. of Kansas*, 302 Kan. 350, 352 P.3d 1032 (2015) (*Fawcett I*), the court held that when a lease provides for royalties based on a share of proceeds from the sale of gas at the well, and the gas is sold at the well, the operator's duty to make gas marketable is satisfied when the operator delivers the gas to the purchaser in a condition acceptable to the purchaser in a good faith transaction. Relying on the undisputed facts presented by the parties, the court further held the leases at issue did not impose on the operator as a matter of law the responsibility to perform the post-

1

production, post-sale gathering, compressing, dehydrating, treating, or processing that may be necessary to convert the gas sold at the wellhead into gas capable of transmission into interstate pipelines.

4.

The law of the case doctrine provides that when a second trial or appeal is pursued in a case, the first decision is the settled law of the case on all questions addressed in a first appeal and reconsideration will not be given to such questions. The law of the case doctrine is a creature of common law with limited exceptions, one of which allows the court to deviate from the law of the case when a controlling authority has made a contrary decision regarding the law applicable to the issues.

5.

Pre-*Fawcett I* caselaw makes clear the implied duty of good faith and fair dealing in oil and gas sales transactions is part and parcel of the implied duty to market, which requires operators to market the gas on reasonable terms as determined by what an experienced operator of ordinary prudence would do, having due regard for the interests of both the lessor and lessee.

6.

*Fawcett I* did not change existing law by introducing for the first time an implied duty of good faith and fair dealing into the marketable condition component of the duty to market or in oil and gas contracts generally.

7.

A party asserting equitable estoppel has the burden to prove that another party, by acts, representations, admissions, or silence when that other party had a duty to speak, induced the party asserting estoppel to believe certain facts existed. The party asserting estoppel must also show the party reasonably relied and acted upon such belief and would

2

now be prejudiced if the other party were permitted to deny the existence of such facts. To determine whether the doctrine applies, courts must look at the facts and circumstances of each case and should not apply it in a formulaic manner.

Review of the judgment of the Court of Appeals in 58 Kan. App. 2d 855, 475 P.3d 1268 (2020). Appeal from Seward District Court; LINDA P. GILMORE, judge. Opinion filed April 15, 2022. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*Rex A. Sharp*, of Sharp Law, LLP, of Prairie Village, argued the cause, and *Barbara C. Frankland* and *Ryan C. Hudson*, of the same firm, were with him on the briefs for appellants/cross-appellees.

*Robert W. Coykendall*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, argued the cause, and *Will B. Wohlford*, of the same firm, was with him on the briefs for appellee/cross-appellant.

*Jeff Kennedy*, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, was on the brief for amicus curiae Kansas Independent Oil and Gas Association.

*David E. Pierce*, of Topeka, and *Keith A. Brock*, of Anderson & Byrd, L.L.P., of Ottawa, were on the brief for amicus curiae Eastern Kansas Oil and Gas Association.

*Charles C. Steincamp*, of Depew Gillen Rathbun & McInteer, LC, of Wichita, and *Joseph A. Schremmer*, University of New Mexico School of Law, of Albuquerque, were on the brief for amicus curiae National Stripper Well Association.

The opinion of the court was delivered by

STANDRIDGE, J.: This is the second appeal in a class action case alleging a breach of the implied duty to market gas and underpaid royalties. In *Fawcett v. Oil Producers, Inc. of Kansas*, 302 Kan. 350, 365-66, 352 P.3d 1032 (2015) (*Fawcett I*), this court held that a well operator may satisfy its duty to market raw gas production if the oil and gas leases provide that raw gas may be sold at the wellhead, the gas is actually sold at the

3

wellhead to a third-party purchaser in a good faith transaction, and the gas is in a condition acceptable to the third-party purchaser at the time of the sale. While recognizing the marketable condition rule deems an operator solely responsible for any pre-sale costs to prepare the gas for the sale, we held an operator could share costs with royalty owners for any necessary post-sale, post-production processing under the leases at issue. We remanded the matter to the district court.

On remand, the class of royalty owners (Class) moved to amend the petition "to clarify" that the sole claim in its original petition—breach of implied duty to market— now "implicates the implied duty of good faith and fair dealing." In support of the amendment, the Class argued *Fawcett I* significantly altered the landscape of Kansas oil and gas law by introducing the concept of an implied duty of good faith and fair dealing, a factual question, into the marketability determination. Oil Producers Inc. of Kansas (OPIK) opposed the motion to amend, arguing *Fawcett I* already resolved the marketable condition issue when it found OPIK satisfied its implied duty to market. OPIK also filed a renewed motion for partial summary judgment given the outcome in *Fawcett I*.

The district court agreed with OPIK's arguments on both issues, denying the Class' motion to amend its petition and granting partial summary judgment for OPIK on the Class' breach of duty to market gas as it relates to the marketable condition rule. The district court also ruled OPIK could not assert a statute of limitations defense to its illegal deduction of conservation fees. Finally, the district court declined to award prejudgment interest to the Class for OPIK's wrongful deduction of conservation fees. Both parties appeal. A Court of Appeals panel affirmed on all issues. *L. Ruth Fawcett Tr. v. Oil Producers Inc. of Kansas*, 58 Kan. App. 2d 855, 876, 475 P.3d 1268 (2020) (*Fawcett II*).

On review, the Class challenges the panel's decision to affirm the district court's denial of its motion to amend and granting of OPIK's summary judgment. The Class also argues the district court and Court of Appeals erred in denying prejudgment interest on

4

the judgment for wrongfully withheld conservation fees. OPIK cross-petitions for review on the Court of Appeals decision affirming the district court's finding that OPIK was equitably estopped from asserting its statute of limitations defense against the conservation fee claim.

We affirm. In *Fawcett I*, this court held that under the leases at issue, "OPIK satisfied its duty to market the gas when the gas was sold at the wellhead." 302 Kan. at 365. The law of the case doctrine precludes the Class from now relitigating its claim that OPIK breached its implied duty of good faith and fair dealing as alleged in the motion to amend the petition. We hold further the Class is not entitled to prejudgment interest. Finally, we hold the district court and panel appropriately applied the equitable estoppel doctrine to bar OPIK's statute of limitations defense to the Class' conservation fee claim.

DUTY TO MARKET AND THE MARKETABLE CONDITION RULE

Under Kansas law, all gas leases impose an implied duty on well operators to market any minerals produced. To satisfy this duty, the operator must market its production at reasonable terms within a reasonable time following production. *Fawcett I*, 302 Kan. at 352.

A corollary of the duty to market is the marketable condition rule that requires well operators to make gas marketable at their own expense, meaning they cannot deduct the expenses to make gas marketable from royalty payments to the landowners. 302 Kan. at 352, 361.

FACTUAL AND PROCEDURAL HISTORY

The Class is comprised of more than 2,200 Kansas royalty owners with mineral rights in Seward County. The Class members lease their mineral rights to OPIK in

5

exchange for a royalty interest in the oil and gas produced under 25 different leases. See *Fawcett I*, 302 Kan. at 351-54. The leases generally have one of two different royalty clauses:

1. "'lessee shall pay lessor as royalty *1/8 of the proceeds from the sale of gas as such at the mouth of the well* where gas only is found'"; or

2. "'lessee shall monthly pay lessor as royalty on gas marketed from each well where gas only is found, *one-eighth (1/8) of the proceeds if sold at the well*, or if marketed by lessee off the leased premises, then one-eighth (1/8) of its market value at the well.'" 302 Kan. at 354.

OPIK produces raw natural gas from wellheads it owns and operates on the leased premises. Generally, gas must meet certain quality standards before reaching the interstate pipeline and being sold in the interstate market. The raw gas OPIK produces from the wellheads is unsuitable for the interstate pipeline. So if the interstate pipeline is its destination, the raw gas must be processed to meet the pipeline quality standards. OPIK does not own any gathering or processing facilities. It sells the raw natural gas at the wellhead to third-party purchasers who can process and prepare the gas for the interstate market.

Under sales contracts between OPIK and third-party purchasers, the purchasers take title to the gas at the wellhead, transport it to a processing plant, process the production, and then sell the processed product to another buyer downstream. The wellhead sales price is based on a formula that starts with the price those third parties receive for the processed gas (or a published index price) then deducts certain costs incurred or adjustments made. OPIK does not buy the processed gas back after title to the gas transfers at the wellhead. OPIK does not charge Class members for any services it

6

may perform on the leased premises to retrieve and prepare the raw unprocessed gas to be sold to the third-party purchasers. See *Fawcett I*, 302 Kan. at 351-54.

Unprocessed gas coming directly from the ground is not as valuable as the processed product later sold in the interstate market, so rather than paying a fixed price for the raw gas, the third-party purchasers pay OPIK for the raw gas received at the wellhead based on the formula. 302 Kan. at 354. In turn, OPIK calculates royalties owed to the Class based on the actual proceeds it receives from the third-party purchasers, less any required taxes. This calculation is at the heart of the Class' lawsuit. See *Fawcett I*, 302 Kan. at 351-54.

The Class' original petition claimed OPIK breached the oil and gas leases by violating its duty to market the gas. In support of its claim, the Class relied on the marketable condition rule that requires well operators to make gas marketable at their own expense. The Class argued this rule requires OPIK to be solely responsible for the processing costs needed to transform the gas into interstate pipeline quality. The Class based this argument on its claim that gas is never in marketable condition until it reaches the interstate pipeline standard. And because the third-party sales contracts deducted expenses for processing the raw gas into interstate pipeline quality (i.e., expenses for making the gas marketable from the Class' perspective), the Class alleged OPIK underpaid royalties when it calculated payments based on the proceeds it received after those processing and other expenses were deducted. See *Fawcett I*, 302 Kan. at 351-54.

The parties filed cross-motions for partial summary judgment on the marketable condition issue. The Class presented its claim as a legal issue, arguing that—as a matter of law—gas is not in a marketable condition until it is enhanced and sold in the interstate market. The Class expressly conceded in its pleadings it was not placing any facts in dispute, e.g., it was not challenging the terms of the third-party sales contracts, it was not challenging the overall price of the third-party contracts, it was not challenging whether

7

the leases allowed the gas to be sold at the wellhead, and it was not challenging that the gas actually was sold at the wellhead. The Class also argued OPIK improperly deducted statutory conservation fees from the proceeds before calculating royalties, a practice this court prohibited in *Hockett v. The Trees Oil Co.,* 292 Kan. 213, 251 P.3d 65 (2011).

After a hearing on the motions, the district court entered summary judgment for the Class and denied it as to OPIK. The court agreed with the Class that OPIK should calculate royalties based on the total value of the sales contracts, meaning the post-processing value of the gas. In doing so, the court implicitly found the marketable condition rule required OPIK to be solely responsible for the costs necessary to transform the gas into interstate pipeline quality. It also found for the Class on the conservation fees claim but stated it would address OPIK's statute of limitations claim at a later point because it was unnecessary to do so in resolving the cross-motions. OPIK timely filed an interlocutory appeal, and the Court of Appeals later affirmed the ruling in *Fawcett v. Oil Producers, Inc. of Kansas*, 49 Kan. App. 2d 194, 306 P.3d 318 (2013), *rev'd* 302 Kan. 350, 352 P.3d 1032 (2015).

On review, this court reversed the district court and the panel. As framed by the parties, the issue in *Fawcett I* was "whether the operator may take into account the deductions and adjustments identified in the third-party purchase agreements when calculating royalties." 302 Kan. at 351. In analyzing this issue, the court first determined that under the leases, OPIK owed a duty to Class members to market the gas it produced. 302 Kan. at 361 (citing *Robbins v. Chevron U.S.A.*, *Inc.*, 246 Kan. 125, 131, 785 P.2d 1010 [1990] [implied duty to market]; *Gilmore v. Superior Oil Co.*, 192 Kan. 388, 392, 388 P.2d 602 [1964]). To satisfy the duty to market, the court noted that a well operator generally must market its gas production "at reasonable terms within a reasonable time following production." *Fawcett I*, 302 Kan. at 361. The duty to market also requires the operator to prepare the gas for the market. If the gas is unmerchantable (i.e., unmarketable) in its natural form, the operator must pay all costs necessary to prepare the

8

gas for the market at no expense to the royalty owners. 302 Kan. at 361. This obligation is known as the marketable condition rule.

The court then analyzed the three Kansas cases that had addressed an operator's duty under the marketable condition rule: *Gilmore*, 192 Kan. at 393 (holding that operators could not deduct costs for compressing the gas to prepare gas for market); *Schupbach v. Cont'l Oil Co.*, 193 Kan. 401, 406, 394 P.2d 1 (1964) (same); and *Sternberger v. Marathon Oil Co.*, 257 Kan. 315, 331-32, 894 P.2d 788 (1995) (holding that operator could share with royalty owners costs of transporting gas to off-lease market where market did not exist at the wellhead and operator did not need to further prepare gas for market). *Fawcett I*, 302 Kan. at 362-64. It noted none of these cases discussed a precise quality or condition at which gas becomes marketable—rather, these cases just assumed without deciding the gas was marketable at the wellhead. We therefore held that what it means to be marketable remains an open factual question—not, as the Class argued, a legal requirement that gas must be in interstate pipeline condition before it is marketable. 302 Kan. at 363-64.

The court ultimately determined *Gilmore*, *Schupbach*, and *Sternberger* establish as a matter of law that when gas is sold at the well, the gas has been marketed. The court also held these cases establish that when an operator is required to pay royalties on the proceeds it receives from any sales at the well, the operator may not deduct any pre-sale expenses required to make the gas acceptable to a third-party purchaser. But the court expressly recognized post-sale post-production expenses to transform raw natural gas into interstate pipeline quality gas differ from pre-sale expenses an operator incurs like drilling for the gas, equipping a well, or delivering the gas to a purchaser. 302 Kan. at 364.

The court then briefly analyzed a Colorado Supreme Court case that held a sale of gas does not yield proceeds unless, at the time of the sale, the gas is in a physical

9

condition that is acceptable for the commercial marketplace and is actually saleable in the location of that commercial marketplace. See 302 Kan. at 364-65 (analyzing *Rogers v. Westerman Farm Co.*, 29 P.3d 887, 906 [Colo. 2001]). The court declined to extend this broad application of the marketable condition rule in this instance. Relying on prior caselaw, this court instead held:

> "[W]hen a lease provides for royalties based on a share of proceeds from the sale of gas at the well, and the gas is sold at the well, the operator's duty to bear the expense of making the gas marketable does not, as a matter of law, extend beyond that geographical point to post-sale expenses. In other words, the duty to make gas marketable is satisfied when the operator delivers the gas to the purchaser in a condition acceptable to the purchaser in a good faith transaction." *Fawcett I*, 302 Kan. at 365.

The court made clear OPIK satisfied its duty to market the gas when it sold the gas at the wellhead because the leases allowed for wellhead sales. 302 Kan. at 365. And based on these legal holdings, the court determined under the undisputed facts of the case that "when calculating Fawcett's royalty, the post-production, post-sale processing expenses deducted by the third-party purchasers are shared." 302 Kan. at 365-66. We remanded the matter to the district court. See 302 Kan. at 351, 366.

The Class promptly moved to amend its petition. To support the amendment, the Class argued *Fawcett I* created a new rule by stating that the marketable condition rule includes an implied duty of good faith and fair dealing. The Class asserted the implied duty of good faith and fair dealing is a fact question the *Fawcett I* court left unresolved. As a result, the Class claimed it should be allowed to amend its petition to allege OPIK breached its duty of good faith and fair dealing by selling gas that was not yet in marketable condition as the Class defined that term, i.e., interstate pipeline quality.

OPIK opposed the Class' motion to amend and renewed its original motion for partial summary judgment. OPIK argued the Class was using its original argument—that

10

gas can never be marketable until it is transformed into interstate pipeline quality—to support a claim that OPIK breached the implied duty of good faith and fair dealing. OPIK argued this court expressly rejected that idea in *Fawcett I* by holding OPIK satisfied its duty to market when it sold the gas at the wellhead. Specifically, OPIK claimed the mandate rule required the district court to enter summary judgment in its favor.

The district court denied the motion to amend after finding the Supreme Court's decision and mandate foreclosed it from reconsidering the issue of good faith. The Court of Appeals affirmed based on the mandate rule. *Fawcett II*, 58 Kan. App. 2d at 861-67.

ANALYSIS

On review, the Class claims the district court and the panel erred (1) in denying the Class' motion to amend the petition; (2) in granting summary judgment for OPIK on the Class' implied duty to market claim; and (3) in applying a more specific statute relating to prejudgment interest rates on payments in oil and gas cases like this one. OPIK cross-petitions for review of the panel's decision affirming the district court's finding that OPIK was equitably estopped from asserting a statute of limitations defense against a claim that OPIK wrongfully deducted conservation fees from Class royalties over a 19-year period. We address each issue in turn.

A. *OPIK's petition for review*

1. *Motion to amend*

The Class moved to amend its petition to allege facts to support its claim OPIK breached its duty of good faith and fair dealing by selling gas that was not yet in marketable condition, a factual question it alleges *Fawcett I* introduced into the marketability analysis for the first time. The district court denied the motion to amend

11

after finding the mandate in *Fawcett I* foreclosed it from reconsidering the issue of good faith. The district court noted: (1) the Class conceded in *Fawcett I* that the contracts were not made in bad faith and the Supreme Court relied on this concession in making its decision; (2) the Supreme Court in *Fawcett I* found OPIK satisfied its duty to market the gas and found OPIK delivered the gas at the wellhead in a condition acceptable to the purchaser in a good faith transaction; and (3) Class counsel admitted at oral argument on the motion to amend petition that its good faith argument necessarily required a finding—as a matter of law—that OPIK cannot sell the gas at the wellhead. The Court of Appeals affirmed the district court's decision to deny the motion to amend. *Fawcett II*, 58 Kan. App. 2d at 861-67.

The parties frame the question presented for review as whether the district court properly applied the *Fawcett I* mandate. We presume they framed it this way because the panel relied on the mandate rule to support its decision. Although we agree with the panel that the district court properly denied the Class' motion to amend, we do so based on the law of the case doctrine rather than the mandate rule.

a. *Law of the case doctrine is distinct from the mandate rule*

While the law of the case doctrine and the mandate rule are related concepts, the two should not be conflated because they are distinct in significant ways. The law of the case doctrine provides that when a second trial or appeal is pursued in a case, the first decision is the settled law of the case on all questions addressed in a first appeal. *State v. Collier*, 263 Kan. 629, 632, 952 P.2d 1326 (1998). Significant to our later analysis, the law of the case doctrine is a creature of common law, and our court has recognized certain limited exceptions to it. See *State v. Clark*, 313 Kan. 556, 575, 486 P.3d 591 (2021) (recognizing law of the case doctrine is a common law rule); *State v. Kleypas*, 305 Kan. 224, 245, 382 P.3d 373 (2016) (recognizing three exceptions to the law of the case doctrine).

12

The mandate rule is grounded in statute instead of common law. K.S.A. 20-108 gives the Kansas appellate courts the authority to issue mandates to Kansas trial courts:

"An appellate court of this state may require the district court of the county where any action or proceeding shall have originated to carry the judgment or decree of the appellate court into execution; and the same shall be carried into execution by proper proceedings, by such district court, according to the command of the appellate court made therein."

K.S.A. 60-2106(c) describes the appellate court process of issuing mandates and discusses the effect of an appellate mandate on the trial court. It provides:

"The supreme court may by rule provide for post decision motions for rehearing or other relief. When under such rule a decision of an appellate court becomes final, such court shall promptly cause to be transmitted to the clerk of the district court its mandate containing such directions as are appropriate under the decision. A copy of the opinion of the court shall accompany and be a part of the mandate. The clerk of the district court shall make a notation thereof on the appearance docket. Such mandate and opinion, without further order of the judge, shall thereupon be a part of the judgment of the court if it is determinative of the action, or shall be controlling in the conduct of any further proceedings necessary in the district court."

Unlike the doctrine of the law of the case, the statutory mandate rule has no recognized exceptions. *Kleypas*, 305 Kan. at 296-97 (citing *Collier*, 263 Kan. at 636). These statutes require a district court to comply with an appellate court's mandate—it cannot change the mandate, make contrary findings to the ones in the mandate, or further review any issues the mandate finally decided. Although we have previously acknowledged that "[s]ome jurisdictions, notably several federal circuit courts, hold that a trial court may depart from a mandate in order to obey new law without first asking permission from the appellate court," we noted that "Kansas cases have not recognized the power of a district court to unilaterally depart from the mandate, even when a change

13

in the law has occurred. And neither K.S.A. 60-2106(c) nor K.S.A. 20-108 contemplate such an exception." 305 Kan. at 297. See also *Bldg. Erection Services Co., Inc. v. Walton Constr. Co.*, 312 Kan. 432, 440-41, 475 P.3d 1231 (2020) (quoting *Kleypas*, 305 Kan. at 296-97). This is true even when, on remand, a district court may be contemplating departure from a mandate based on new intervening law. See *Bldg. Erection Servs. Co.*, 312 Kan. at 441 ("So while different panels of the Court of Appeals hearing successive appeals in the same case may, in exceptional circumstances, depart from the law of the case, under Kansas law no exceptional circumstances permit a lower court to circumvent the mandate of a higher court.").

The statutory mandate rule is a specific application of the law of the case doctrine, but to different ends. The law of the case doctrine applies to both the higher and lower court in a single proceeding, while the mandate rule acts as an exclusive limit on the ability of a trial court to review issues outside the scope of an appellate court's remand. This is not a distinction without a difference. The appellate court's mandate is its judgment—after transmitting the mandate to the trial court, that court is vested with authority to act in conformance to the mandate. The trial court's authority extends only as far as the scope of the mandate, and it must diligently follow the mandate to make sure its order complies with the appellate court's decision. If the appellate court's instructions on remand are general, the trial court must examine the appellate court's opinion and exercise its discretion in determining what further proceedings are necessary and would adhere to the opinion on remand. If the mandate directs the trial court to proceed as specifically directed in the opinion, then the trial court must consult the opinion to determine how to appropriately proceed.

In *Fawcett I*, we framed the issue presented by the parties as a legal one requiring us to "decide whether the operator may take into account the deductions and adjustments identified in the third-party purchase agreements when calculating royalties." 302 Kan. at 351. We ultimately reversed "on the issue subject to our review" and remanded "for

14

further proceedings." 302 Kan. at 351. As for "the issue subject to our review," we held that

> "when a lease provides for royalties based on a share of proceeds from the sale of gas at the well, and the gas is sold at the well, the operator's duty to bear the expense of making the gas marketable does not, as a matter of law, extend beyond that geographical point to post-sale expenses. In other words, the duty to make gas marketable is satisfied when the operator delivers the gas to the purchaser in a condition acceptable to the purchaser in a good faith transaction. OPIK satisfied its duty to market the gas when the gas was sold at the wellhead. When calculating Fawcett's royalty, the post-production, post-sale processing expenses deducted by the third-party purchasers are shared. [Citations omitted]." 302 Kan. at 365-66.

Without any instructions for further proceedings on remand, we find no mandate with which the district court needed to comply.

Although the district court denied the Class's motion to amend based on the *Fawcett I* decision "and the mandate," the court's explanation reflects its decision was grounded in the law of the case doctrine:

> "2. The Supreme Court noted: 'both parties argue there are no material facts in dispute.'

> "3. The court finds the Kansas Supreme Court found that OPIK satisfied its duty to make the gas marketable. In the holding, the Court stated:

>> 'In other words, the duty to make gas marketable is satisfied when the operator delivers the gas to the purchaser in a condition acceptable to the purchaser in a good faith transaction. OPIK satisfied its duty to market the gas when the gas was sold at the wellhead. When calculating Fawcett's royalty, the post-production, post-sale processing expenses deducted by the third-party purchasers are shared.'

15

"4. Thereafter, the Supreme Court stated:

'In this case, Fawcett does not challenge OPIK's good faith, its prudence in entering into the purchase agreements at issue, or their material terms. Accordingly, we need not dwell further on what this might entail.'

"5. In finding that OPIK satisfied its duty to market the gas, the court found the operator delivered the gas to the purchaser in a condition acceptable to the purchaser in a good faith transaction.

"6. *Counsel for Plaintiff admits today that in this case a good faith argument requires a finding that OPIK can't sell the gas at the well head.*

"7. The court find that based upon the Supreme Court decision and the mandate, this court is foreclosed from reconsidering the issue of good faith sales as Plaintiff conceded the contracts were not made in bad faith and that concession was relied upon by the Supreme Court.

"8. The court denies Plaintiff's motion to file a first amended petition." (Emphasis added.)

OPIK urges us to affirm the district court's decision. The Class disagrees, asserting *Fawcett I* created a new rule that the marketable condition rule includes an implied duty of good faith and fair dealing. If the Class had properly framed its argument in the context of the law of the case doctrine instead of the mandate rule, the Class argument would be that its claim falls under the second exception allowing the court to deviate from the law of the case when a change in the applicable law occurs after a prior decision has been made. *Kleypas*, 305 Kan. at 245 (recognizing three exceptions to the law of the case doctrine, including when a controlling authority makes a contrary decision on the law applicable to the issues).

To determine whether an exception to the law of the case doctrine applies here, we must decide whether *Fawcett I* changed the existing law by introducing for the first time

16

an implied duty of good faith—a factual question—into the duty to market and its corollary marketable condition rule.

> b. Fawcett I *did not change existing law, which already imposed an implied duty of good faith in the duty to market and its corollary, the marketable condition rule*

The Class argued in the first appeal that, as a matter of law, raw gas is never in marketable condition until enhanced to meet interstate pipeline quality. We rejected that interpretation of the marketable condition rule. We held that under the leases at issue, "OPIK satisfied its duty to market the gas when the gas was sold at the wellhead." *Fawcett I*, 302 Kan. at 365. We explained that a well operator may satisfy its duty to market raw gas production if the oil and gas leases provide that raw gas may be sold at the wellhead, the gas is actually sold at the wellhead to a third-party purchaser in a good faith transaction, and the gas is in a condition acceptable to the third-party purchaser at the time of the sale. 302 Kan. at 365.

In its motion to amend on remand, the Class relied on two excerpts from the *Fawcett I* opinion to argue that we created a new rule (and therefore a possible exception to the law of the case doctrine) that incorporates an implied duty of good faith and fair dealing into the marketable condition rule:

> "Notably absent from [Kansas caselaw] is any discussion of a precise quality or condition at which gas becomes 'marketable, despite their conclusive declarations about whether the gas at issue was marketable at the well. *What it means to be 'marketable' remains an open question.* But the answer is not simply, as Fawcett would have us hold, interstate pipeline quality standards or downstream index prices." (Emphasis added.) 302 Kan. at 363-64.

> "We are sensitive to the potential for claims of mischief given an operator's unilateral control over production and marketing decisions. But we believe royalty owners' interests are adequately protected *by the operator's implied covenant of good faith and fair dealing* and the implied duty to market." (Emphasis added.) *Fawcett I*, 302 Kan. at 366.

The Class construes these two paragraphs to significantly alter the landscape of Kansas oil and gas law by introducing for the first time the concept of an implied duty of good faith and fair dealing—a factual question—into the marketable condition rule. For the reasons stated below, we reject the Class' argument that *Fawcett I* created a new rule.

In the first paragraph excerpted by the Class, we acknowledged that what it means to be "marketable" remains an open question. But we held that "the [implied] duty to make gas marketable is satisfied when the operator delivers the gas to the purchaser in a condition acceptable to the purchaser in a good faith transaction." 302 Kan. at 365 (citing *Waechter v. Amoco Prod. Co.*, 217 Kan. 489, Syl. ¶ 2, 537 P.2d 228 [1975]). But contrary to the Class' assertion, *Fawcett I* is not the first time we recognized a good faith requirement in the implied duty to market. In fact, we made clear in *Fawcett I* that an implied duty of good faith in a sales transaction between a lessee and a third-party purchaser has been a component of the implied duty to market in Kansas for at least 45 years:

> "An oil and gas lease which provides that the lessee shall pay lessor monthly as royalty on gas marketed from each well one eighth of the proceeds if sold at the well, or, if marketed off the leased premises, then one-eighth of the market value at the well, is clear and unambiguous as to gas sold at the wellhead by the lessee *in a good faith sale*, and lessor is entitled to no more than his proportionate share of the amount actually received by the lessee for the sale of the gas." (Emphasis added.) 302 Kan. at 359 (quoting *Waechter v. Amoco Production Co.*, 217 Kan. 489, Syl. ¶ 2, 537 P.2d 228 [1975], and citing *Matzen v. Cities Service Oil Co.*, 233 Kan. 846, 850-51, 667 P.2d 337 [1983]; *Lightcap v. Mobil Oil Corp.*, 221 Kan. 448, 460, 562 P.2d 1 [1977]).

18

In *Robbins v. Chevron U.S.A., Inc.*, 246 Kan. 125, 131, 785 P.2d 1010 (1990), we stated that the implied duty to market imposes on the lessee an obligation to market the produced minerals at reasonable terms within a reasonable time following production. We said that a lessee's marketing activities are measured by the standard of a reasonably prudent operator, which is primarily a question of fact. 246 Kan. at 131. We quoted the rule by which a lessee's performance is measured: "'The standard by which [both the lessor and the lessee] are bound is what an experienced operator of ordinary prudence would do under the same or similar circumstances, having due regard for the interests of both.'" 246 Kan. at 131 (quoting *Adolph v. Stearns*, 235 Kan. 622, 626, 684 P.2d 372 [1984]).

Our prior caselaw makes clear the implied duty of good faith and fair dealing in oil and gas sales transactions is part and parcel of the implied duty to market, which requires operators to market the gas on reasonable terms as determined by what an experienced operator of ordinary prudence would do, having due regard for the interests of both the lessor and lessee. See *Fawcett I*, 302 Kan. at 366 (citing *Smith v. Amoco Prod. Co.*, 272 Kan. 58, 85, 31 P.3d 255 [2001]; *Robbins*, 246 Kan. at 131). Given that caselaw, the Class could have alleged in its original pleading (before *Fawcett I*) that OPIK breached the good faith component of its implied duty to market by selling gas on terms that would be unreasonable from the perspective of an experienced operator of ordinary prudence, considering the interests of both the lessor and lessee. In fact, the transcript from the hearing on the parties' cross-motions for summary judgment reflects OPIK's counsel raised this issue to the Class at least twice:

"[I]f the royalty owner does not like the way that the gas is marketed, he has a remedy. He can challenge the prudence of the gas purchase contract. He can challenge whether the producer is doing an appropriate job selling the gas. He can recover money, if the Court finds that the producer is acting imprudently in selling the gas that way.

19

. . . .

> "And under our deal with the landowner is, we split what we get for the gas, at
> that point, seven-eighths and one-eighth. That is our deal. And you know, if there is a
> greater value than that, if somebody else could do a better job changing that gas stream
> into more money, and we should have done a better job negotiating a better contract with
> someone, then the royalty owner can challenge our prudence in entering into this
> contract."

But despite the existing caselaw and opposing counsel's statements at the hearing, the Class deliberately chose not to interject a factual issue of good faith and fair dealing into the lawsuit. Instead, the Class argued in its original appeal that, as a matter of law, OPIK could not satisfy the marketable condition rule until it paid to have the raw gas transformed into interstate-pipeline-quality gas. And to reach that issue in its motion for summary judgment, the Class expressly conceded it did not challenge the terms of the third-party sales contracts or the overall price of the contracts. It also did not challenge that the leases allowed the gas to be sold at the wellhead or that the gas was actually sold at the well.

This court rejected the Class' interpretation of the marketable condition rule as a matter of law. In doing so, we specifically recognized the Class' concessions and further observed the Class never challenged the terms of the sales contracts as unreasonable or whether the sales at the well were made in bad faith. See *Fawcett I*, 302 Kan. at 360 (noting the Class did not question the negotiated formulas in the sales contracts, the reasonableness of the sales, or whether OPIK entered into good faith transactions); 302 Kan. at 366 ("In this case, Fawcett does not challenge OPIK's good faith, its prudence in entering into the purchase agreements at issue, or their material terms. Accordingly, we need not dwell further on what this might entail."). So based on the Class' concessions and the fact the leases expressly provided for sales of gas at the well, we held OPIK

20

satisfied its legal duty to market the gas when it sold the gas to the third-party purchasers in what the Class conceded was a good faith transaction. *Fawcett I*, 302 Kan. at 365-66.

Given pre-*Fawcett I* cases put the Class on notice that it could have alleged facts to support a claim OPIK acted in bad faith—if those facts existed—we find no merit to the Class' claim now that an exception to the law of the case doctrine applies because *Fawcett I* changed the existing law.

As for the second excerpted paragraph above, it appears the Class might be arguing *Fawcett I* created a new implied duty of good faith and fair dealing in oil and gas contract cases that would be separate and distinct from the implied duty of good faith in the marketable condition component of the duty to market. We have previously described the implied duty of good faith and fair dealing in contracts as follows:

> "'Every contract implies good faith and fair dealing between the parties to it, and a duty of cooperation on the part of both parties . . . . [T]here is an implied undertaking in every contract on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out his part of the agreement, or do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Ordinarily if one exacts a promise from another to perform an act, the law implies a counterpromise against arbitrary or unreasonable conduct on the part of the promisee.'" *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 965, 298 P.3d 250 (2013) (quoting *Bonanza, Inc. v. McLean*, 242 Kan. 209, 222, 747 P.2d 792 [1987]).

Under the facts here, we find no practical difference between good faith in the marketable condition component of the duty to market (requiring operators to market the gas on reasonable terms as determined by what an experienced operator of ordinary prudence, having due regard for the interests of both the lessor and lessee, would do under the same or similar circumstances) and the implied covenant of good faith and fair

21

dealing in oil and gas contracts (prohibiting operators from arbitrary or unreasonable acts in marketing the gas that will have the effect of destroying or injuring the lessor's rights). But even if there were a practical difference as applied here, an operator's general duty of good faith and fair dealing—compliance with which is a factual question—clearly predated *Fawcett I*. So the Class was on notice of this and had the opportunity in its initial pleading to allege facts to support a claim that OPIK breached that duty. The Class did not do so. Instead, the Class alleged OPIK breached its implied duty to market the gas and specifically framed the issue as one that could be decided as a matter of law.

In sum, we conclude *Fawcett I* did not change existing law by introducing for the first time an implied duty of good faith and fair dealing into the marketable condition component of the duty to market or in oil and gas contracts generally. With no contrary decision by a controlling authority that changes existing law on the implied duty of good faith and fair dealing, there is no merit to the Class' claim that the *Fawcett I* decision creates an exception to the law of the case doctrine that would allow the Class to amend its petition on that issue. The district court did not err in denying the Class' motion to amend.

2. *The law of the case and OPIK's renewed motion for partial summary judgment*

Having determined *Fawcett I* did not change existing law on good faith and the "change in the law" exception to the law of the case doctrine is inapplicable, we apply the law of the case doctrine to determine whether the district court erred in granting OPIK's renewed motion for summary judgment.

The Class claimed in its original petition that OPIK breached its duty to market by reducing royalty payments for expenses incurred before the gas products were in a marketable condition. This claim depended entirely on adopting a new legal principle in Kansas holding—as a matter of law—that gas can never be in marketable condition until

22

it reaches the interstate pipeline standard. We rejected the Class' interpretation of the marketable condition rule. *Fawcett I*, 302 Kan. at 361 ("We disagree with Fawcett's equating 'marketable condition' with interstate pipeline quality.").

We also held the leases here did not impose on the operator—as a matter of law—the responsibility to perform and pay the expenses for the post-production, post-sale gathering, compressing, dehydrating, treating, or processing that may be necessary to convert the gas sold at the wellhead into gas capable of transmission into interstate pipelines. And we held that a well operator may satisfy its duty to market raw gas production at the wellhead if the oil and gas leases provide that raw gas may be sold at the wellhead, the gas is actually sold at the wellhead to a third-party purchaser in a good faith transaction, and the gas is in a condition acceptable to the third-party purchaser at the time of the sale. 302 Kan. at 365. Finally, and based on these legal principles and undisputed facts, we held OPIK satisfied its duty to market the gas when the gas was sold at the wellhead under the formula-based pricing in this case, and that—when calculating the Class' royalty—the post-production, post-sale processing expenses deducted by the third-party purchasers to calculate the wellhead sale price were properly shared. 302 Kan. at 365-66.

OPIK renewed its motion for partial summary judgment after remand to the district court, citing the holdings in *Fawcett I*. It argued there were no disputes in material fact, so it was entitled to judgment as a matter of law. In opposing summary judgment for OPIK, the Class referred to its amended petition seeking to introduce a dispute in material fact, and proffered expert reports and additional declarations to show the factual nature of what it means for gas to be marketable.

After oral argument, the district court granted OPIK's renewed partial motion for summary judgment. The court did not adopt the Class' proffered expert reports or the new declarations, presumably because these evidentiary proffers were not material facts

relevant to summary judgment since the court had denied the Class' motion to amend. After setting forth the well-known standard for summary judgment, the court stated:

"4.      The court finds the Kansas Supreme Court found that OPIK satisfied its duty to make the gas marketable. *Fawcett*, at 1042. In the holding, the Court stated:

'In other words, the duty to make gas marketable is satisfied when the operator delivers the gas to the purchaser in a condition acceptable to the purchaser in a good faith transaction. See *Waechter*, 217 Kan. 489, Syl. ¶ 2. OPIK satisfied its duty to market the gas when the gas was sold at the wellhead. When calculating Fawcett's royalty, the post-production, post-sale processing expenses deducted by the third-party purchasers are shared.'

"5.      Thereafter, the Supreme Court stated:

'In this case, Fawcett does not challenge OPIK's good faith, its prudence in entering into the purchase agreements at issue, or their material terms. Accordingly, we need not dwell further on what this might entail.'

"6.      In finding that OPIK satisfied its duty to market the gas, the court found the operator delivered the gas to the purchaser in a condition acceptable to the purchaser in a good faith transaction.

"7.      There is no genuine issue as to any material fact. The court grants summary judgment to OPIK."

On appeal, the Class claimed to the Court of Appeals that the district court erred in granting partial summary judgment for OPIK. In its appellate brief, the Class explained that, in 2011, the parties filed cross-motions for summary judgment with the trial court in

24

which "[t]he Class contended that, *as a matter of law*, none of the gas was in marketable condition until it reached interstate pipeline quality" and "OPIK contended that, *as a matter of law*, all of the gas produced was in marketable condition when it was saleable." The Class readily acknowledged the *Fawcett I* court based its decision on three concessions of fact made by the Class in seeking judgment as a matter of law:

> "'(1) The gas in this case was sold at the wellhead.' [*Fawcett I*], 302 Kan. at 351 (quoting the Court of Appeals opinion, *Fawcett*, 49 Kan.App.2d at 199 ('[T]he geography of the sale of gas was at the well and the geography for the calculation of the royalty was also at the well' and stating, 'The parties have taken no exception to the panel's conclusions in this regard.'));

> "(2) The 'at the well' language in the lease sets the valuation point. See 302 Kan. at 354, 359-60; and

> "(3) 'Fawcett does not challenge OPIK's good faith, its prudence in entering into the purchase agreements at issue, or their material terms. Accordingly, we need not dwell further on what this might entail.' 302 Kan. at 366."

The Class noted in its appellate brief that it moved to amend its petition, to engage in discovery, and to offer new evidence. The Class explained to the panel that it did this "to put into dispute each of the three factual appellate concessions" it previously had made to seek judgment as a matter of law in *Fawcett I*. The panel affirmed summary judgment for OPIK, holding the mandate rule required it to do so. *Fawcett II*, 58 Kan. App. 2d at 861-67.

Although we agree with the panel the district court properly granted summary judgment for OPIK on the Class' duty to market claim, we again do so based on the law of the case doctrine instead of the mandate rule. As noted earlier, the *Fawcett I* court reversed the decision to grant partial summary judgment for the Class and remanded the case with no instructions for further proceedings, so there was no mandate on remand

25

with which the district court had to comply. Like the decision to deny the Class' motion to amend, the district court's decision to grant summary judgment on the duty to market makes sense when viewed in the context of the law of the case doctrine.

In its renewed motion for summary judgment, OPIK argued it was entitled to summary judgment on the duty to market claim because the post-production, post-sale processing expense allocation issue had been fully litigated and finally resolved in *Fawcett I* based on the undisputed material facts in the case. See *Collier*, 263 Kan. at 632 (under the law of the case doctrine, "the first decision is the settled law of the case on all questions involved in the first appeal and reconsideration will not be given to such questions"). Notably, the Class did not dispute that the issue had been fully litigated and finally resolved based on undisputed facts. And remember that in *Fawcett I* the parties filed cross-motions for summary judgment presenting the issue as a purely legal one for the court to resolve:  the point at which royalties should be calculated. In doing so, the Class expressly and repeatedly advised the district court and OPIK that any factual evidence related to the prudent operator standard, market value, sales price, and expert opinion is irrelevant. These are some examples:

Class' Response to OPIK's Motion for Partial Summary Judgment:

- The Class states it is not arguing OPIK was an imprudent operator and accepts pricing terms of the sales contracts as they are.

- The Class states again it accepts the terms of the sales contracts as they are. It also states that any evidence related to the prudent operator standard, market value, sales price, and expert opinion is irrelevant.

26

- The Class states the actual pricing terms of the sales contracts are irrelevant because the parties are only arguing the point at which royalties should be calculated (i.e., based on the total value of the sales contracts or based on the actual profit OPIK receives).

- The Class again states it accepts the terms of the sales contracts as they are. It also states any evidence related to the prudent operator standard, market value, sales price, and expert opinion is irrelevant.

Transcript from oral argument on cross-motions for partial summary judgment:

- The Class counsel specifically notes the terms of the sales contracts (or if they are actually sales contracts) does not really matter. Class counsel then notes the services/costs is an issue between OPIK and the third-party purchaser. Class counsel states royalties should be calculated as a matter of law on the total value of the sales contracts with no deductions for expenses.

Relying on these concessions and the lack of any allegation by the Class that OPIK failed to act in good faith, the *Fawcett I* court found OPIK satisfied its duty to market the gas when it sold the gas to a third-party purchaser at the well in a good faith transaction. 302 Kan. at 365-66. On remand, the district court entered summary judgment for OPIK.

As we have noted, the Class both in the district court and on appeal candidly acknowledged it sought to reverse course and put its previous factual concessions into dispute. But the law of the case doctrine precludes the Class from reversing course like this. As expressly acknowledged by the Class, the legal issue resolved against it was

unequivocally decided by the *Fawcett I* court based on the Class' concessions. And based on those facts, the *Fawcett I* court held that under the leases at issue, "OPIK satisfied its duty to market the gas when the gas was sold at the wellhead" and "[w]hen calculating Fawcett's royalty, the post-production, post-sale processing expenses deducted by the third-party purchasers are shared." 302 Kan. at 366. To allow the Class an opportunity to retreat from those facts now conflicts with the purpose of the law of the case doctrine—to prevent a party from serially litigating an issue already presented and decided on appeal in the same proceeding. The doctrine

> "promotes the finality and efficiency of the judicial process. The law of the case is applied to avoid indefinite relitigation of the same issue, to obtain consistent results in the same litigation, to afford one opportunity for argument and decision of the matter at issue, and to assure the obedience of lower courts to the decisions of appellate courts." *State v. Collier*, 263 Kan. 629, Syl. ¶ 2, 952 P.2d 1326 (1998).

To allow the Class now to put facts in dispute that it previously deemed admitted would give the Class an impermissible second bite at the apple on the marketable condition question when it was fully litigated in *Fawcett I*. The law of the case doctrine precludes the Class from relitigating its claim that OPIK breached its duty to market.

Before wrapping up this discussion, we find it necessary to briefly address the "intended market" good faith argument made by the Class for the first time in its petition for review and supplemental brief before this court. In raising this issue to us, the plaintiff relies on *Cooper Clark Foundation v. Oxy USA,* 58 Kan. App. 2d 335, 469 P.3d 1266 (2020), in which a Court of Appeals panel engaged in a novel intended market analysis to distinguish the facts presented from those presented in *Fawcett I*. See *Cooper Clark*, 58 Kan. App. 2d at 343 ("Like our case, *Fawcett* [*I*] involved a class action for royalty underpayment. But unlike this case, the gas company in *Fawcett* [*I*] sold the gas to third parties at the well."). In *Cooper Clark*, the producer supplied a third-party processor (Amoco) with the producer's raw gas from the well to have Amoco extract individual

28

components from it. Amoco charged a monetary and an in-kind processing fee for its services. Amoco then delivered the extracted components back to the producer, who then sold the extracted components in the interstate market. So the sale of raw gas in *Cooper Clark* was not made at the well (as the Class concedes it was here). And because the gas was not sold at the well, the panel focused on the sales price at the "intended market."

We find several problems with the Class' "intended market" argument. First, the Class is precluded by the law of the case doctrine from raising a good faith argument based on an intended market theory when it conceded in the first litigation that (1) the gas leases here provide that raw gas may be sold at the wellhead, (2) the gas was sold at the wellhead in a condition acceptable to the third-party purchaser, and (3) it was not challenging OPIK's good faith, its prudence in entering into the purchase agreements at issue, or their material terms. And there is no exception to the law of the case doctrine because the *Cooper Clark* decision was made by the Court of Appeals, which is not a controlling authority, and the *Cooper Clark* panel distinguished *Fawcett I* on its facts, thereby acknowledging that *Fawcett I* remains good law. Second, the Class makes this argument without citing any authority for us to address it for the first time on review. Third, *Cooper Clark* is distinguishable on its facts, not just because the producer received the gas components back for it to sell after Amoco processed it, but because the appeal was decided in the procedural context of class certification.

We hold the Class is precluded by the law of the case doctrine from raising a good faith argument based on an intended market theory. Although the discussion above reflects many substantive problems with the Class' newly developed intended market argument, we expressly base our holding on the concessions made by the Class in the first litigation.

The district court's decision to grant OPIK's renewed motion for summary judgment is affirmed.

3.  *Prejudgment interest rate*

There was no dispute in *Fawcett I* that the Class was entitled to judgment as a matter of law on its claim that OPIK wrongfully deducted conservation fees from royalty payments. On remand, the parties stipulated to the principal amount of the improper underpayment between January 1996 and October 2015. The amount was divided into two categories:  in the first, the parties agreed $49,000 was owed to the Class *within* the statute of limitations period (between August 2006 and October 2015); and in the second category, they agreed an additional $49,000 covered the amount owed *outside* the statute of limitations period (January 1996 to July 2006). These figures stemmed from estimated monthly averages over the 19-year period. Both parties agreed neither would rely on experts to determine an actual damages figure during that time.

The Class moved for partial summary judgment claiming it was entitled to prejudgment interest on the stipulated amounts. In its motion, the Class argued it was entitled to a flat 10 percent annual interest rate under K.S.A. 16-201, a general prejudgment interest statute. The Class urged the court to reject application of K.S.A. 55-1615, which is a more specific interest statute for payments made in oil and gas cases. It claimed the more specific statute only pertained to late royalty payments held in suspense accounts. In response, OPIK argued the lower variable interest rate in K.S.A. 55-1614(h) and K.S.A. 55-1615—the more specific statutes—applied.

In denying the Class' summary judgment motion on the statutory interest rate issue, the district court held K.S.A. 55-1615 was applicable. The court found:

> "The court rejects Plaintiff's position that K.S.A. 55-1615 pertains only to the subject of interest on suspense payments, and not to interest on underpaid royalty. A plain reading of the statute does not distinguish between suspended, delayed or timely but

30

underpaid royalty payments. The court finds the improper deduction of conservation fees is a wrongfully withheld payment and K.S.A. 55-1615 applies."

Having denied summary judgment, the district court held a hearing on the prejudgment interest issue. The Class submitted expert evidence at the hearing despite the parties' stipulation not to rely on experts to determine actual damages but instead use an estimated amount of damages for royalty underpayments based on improper conservation fee deductions. The district court declined to consider that evidence based on the earlier stipulation. Reiterating that K.S.A. 55-1615 applied and stating that the interest rate in K.S.A. 55-1615 is a constantly changing monthly rate, the court observed it would take more than "simple math" to determine the interest due:

"In this case, the parties stipulated to an amount of wrongfully withheld conservation fees. [The Class] has divided the lump sum amount to cover the applicable periods on an annual basis and then appears to have split the annual amount into equal monthly amounts for purposes of calculating prejudgment interest. The court finds this claim was not liquidated and is unable to ascertain that a specific and definite amount was owed on a specific due date. This court cannot determine based on the attachments [provided] that the amount of prejudgment interest became definitely ascertainable by mathematical calculation. The court concludes the amount owed was not liquidated until the parties agreed on the amount and submitted the same as a stipulation in the pretrial order. Prejudgment interest prior to that day is denied."

The Class appealed, arguing the district court failed to apply the correct prejudgment interest statute. The panel affirmed the district court's ruling. *Fawcett II*, 58 Kan. App. 2d at 867-70. The Class petitioned for review on this issue. We begin our analysis by setting out the two prejudgment statutes.

31

K.S.A. 16-201, set forth in Chapter 16, Contracts and Promises, provides:

"Creditors shall be allowed to receive interest at the rate of ten percent per annum, when no other rate of interest is agreed upon, for any money after it becomes due; for money lent or money due on settlement of account, from the day of liquidating the account and ascertaining the balance; for money received for the use of another and retained without the owner's knowledge of the receipt; for money due and withheld by an unreasonable and vexatious delay of payment or settlement of accounts; for all other money due and to become due for the forbearance of payment whereof an express promise to pay interest has been made; and for money due from corporations and individuals to their daily or monthly employees, from and after the end of each month, unless paid within fifteen days thereafter."

This statute can generally apply to all prejudgment interest claims on general unpaid sums. See *Owen Lumber Co. v. Chartrand*, 283 Kan. 911, 925, 157 P.3d 1109 (2007). It sets an annual flat 10 percent rate, and as noted above, that rate kicks in once a damages award is considered liquidated. See K.S.A. 16-201.

K.S.A. 55-1615, set forth in Chapter 55, Oil and Gas, provides:

"The payor shall owe its payee interest on any payment, other than excluded payments, at the interest rate provided herein, determined on the first business day of the month that interest commences to accrue for that payment. For each subsequent month, the payor shall owe its payee interest on the unpaid balance due payee on the last day of the month preceding such subsequent month at the interest rate provided herein determined on the first business day of each such subsequent month. Interest shall commence to accrue 60 days following the last calendar day of the month of first sale and shall cease to accrue upon the day that payor places the payment in the United States mail, postage prepaid and addressed to payee. In the event a payor pays a payee's payment or portion thereof to a state under applicable unclaimed, abandoned or escheat property laws, then payor's obligation to pay interest on the portion paid over to the state shall cease upon the day that such state receives the payment from payor.

> Notwithstanding the above, interest shall not commence on oil or gas sales occurring during the first 60 days following the initial sale provided payment is placed in the United States mail, postage prepaid, and addressed to payee, within 120 days following the last calendar day of the month of the initial sale."

This statute provides for a more complicated interest calculation. K.S.A. 55-1614(h) defines "interest rate provided herein" as one and a half percent plus prime. The prime rate may change monthly and is set on the first business day of each month. See K.S.A. 55-1614(h); K.S.A. 55-1615. In other words, this is a variable interest rate that not only requires knowledge of the exact rate to use each month, but it also requires knowing the exact balance owed each month.

On review, the Class claims K.S.A. 16-201—the more general annual flat rate interest calculation statute—should apply. OPIK disagrees, arguing the district court and the panel correctly determined that K.S.A. 55-1615 applied to calculating prejudgment interest for underpayment of oil and gas royalties. OPIK also asserts this court may be unable to decide this issue because the Class failed to challenge the district court's denial of prejudgment interest. As a result, OPIK claims any opinion this court issues would be purely advisory.

At the outset, we are not persuaded by OPIK's claim that the Class failed to challenge the district court's decision to deny prejudgment interest. As the Class points out in its reply brief, the district court denied an award of prejudgment interest based on its determination K.S.A. 55-1615 applied. Because K.S.A. 55-1615 requires calculation of certain variable interest rates at certain times (monthly or annually depending) and because the parties stipulated to a set damages award without calculating what the actual damages were at any point in time, the district court determined it was impossible to award any prejudgment interest based on K.S.A. 55-1615.

33

Having determined the district court's decision to deny prejudgment interest is an issue preserved for review, we move to the Class' suggestion that the district court would have awarded prejudgment interest under K.S.A. 16-201. But the Class' suggestion is speculative because it necessarily assumes the parties' stipulation to an award of damages entitles the Class to prejudgment interest under K.S.A. 16-201. Although K.S.A. 16-201 sets a flat rate to be applied annually, the statute still requires a damages award be liquidated before awarding prejudgment interest. "A claim becomes liquidated when both the amount due and the date on which such amount is due are fixed and certain or when the same become definitely ascertainable by mathematical calculation." *Owen Lumber Co. v. Chartrand*, 283 Kan. 911, 925, 157 P.3d 1109 (2007).

The district court found the parties' stipulated damages did not become liquidated until they entered the stipulation. The record supports this. The agreed money damages for unpaid conservation fees were calculated using monthly averages based on rough estimates over 19 years. The damages were not a sum certain on any set date, they were not based on actual review of OPIK's records, and the parties agreed not to use expert witnesses to determine a sum certain on any set date. Instead, the parties stipulated to an approximation so the court efficiently could decide on summary judgment which prejudgment interest statute applied. The Class now necessarily assumes this stipulated-to amount equals a liquidated sum certain due and owing for each of those years. But the evidentiary record establishes the stipulated damages did not become liquidated (the amount due and the date on which such amount is due became fixed and certain) until the parties entered into the stipulation itself. See *Kilner v. State Farm Mut. Auto. Ins. Co.*, 252 Kan. 675, 687, 847 P.2d 1292 (1993) (prejudgment interest not available where party had stipulated to amount due for purposes of allowing court to determine legal issue).

Based on the evidentiary record before us and the district court's findings based on that evidence, we hold the Class is not entitled to prejudgment interest under K.S.A. 16-201 or K.S.A. 55-1615 because the parties' stipulated award for damages here did not

become liquidated until they entered into the stipulation. In reaching this holding, we specifically decline to decide which statute applies to determine the prejudgment interest amount when the debt is proven adequately to support such an award.

To the extent the district court and Court of Appeals held that K.S.A. 55-1615 controls as a matter of law, we vacate that holding and affirm the decision as right for the wrong reason. See *State v. Bacon*, 309 Kan. 1235, 1239, 443 P.3d 1049 (2019) (affirming Court of Appeals as right for the wrong reason).

B. *Equitable estoppel*

OPIK argued to the district court that the statute of limitations barred the Class from collecting the $49,000 in stipulated damages for conservation fees improperly deducted from royalty payments between January 1996 and July 2006, which was five years before the Class filed suit. In response, the Class argued OPIK was equitably estopped from asserting the statute of limitations defense because OPIK hid the deductions by disguising them as state severance taxes on their monthly check stubs, and the royalty owners detrimentally relied on that deception to not bring suit until 2011.

After a bench trial, the district court held OPIK was equitably estopped from asserting a statute of limitations defense. Based on witness testimony and other evidence presented at the trial, the district court found that royalty owners relied on the check stubs to be truthful and accurate. This finding of fact stemmed from evidence that the owners continued cashing their checks without ever questioning the deductions. The court noted the check stubs provided royalty owners with no information about the conservation fee deductions because the fee consistently was lumped in with and mislabeled as a state tax—a fact an OPIK representative admitted at trial.

The district court concluded the Class established all three elements of equitable estoppel: (1) OPIK made an affirmative representation on the check stubs that induced the royalty owners into believing the conservation fees were state taxes when they were not; (2) the royalty owners relied on that misrepresentation because OPIK never provided them with any other information about the taxes owed, and OPIK admitted that it expected the owners to rely on the stubs; and (3) the Class would be prejudiced if OPIK were "permitted to deny its deduction of Conservation Fees disguised as taxes." The court also found the Class was not the sole cause of OPIK's acts or omissions in this case: OPIK was the party who wrongfully deducted the fees by improperly disguising them as taxes, by failing to inform the owners of those improper deductions when it had and controlled all the information about those deductions, and by expecting royalty owners to rely on those check stubs as truthful and accurate. Based on these factual and legal findings, the court rejected OPIK's arguments that it never intended to deceive the royalty owners and that the owners should have asked about the check stub deductions. The court noted that intent to deceive is not an element of estoppel. The court highlighted the fact OPIK itself, when a representative was questioned, did not know what fees were in the aggregate figure. So even if the royalty owners had inquired, the court determined it was unclear whether OPIK could have provided them with a correct answer about the deductions.

OPIK cross-appealed, and the panel affirmed. *Fawcett II*, 58 Kan. App. 2d at 870-76. OPIK filed a cross-petition for review alleging the panel improperly conflated the equitable estoppel doctrine with the discovery accrual rule.

Whether equitable estoppel applies involves a question of fact. See *Steckline Communications, Inc. v. Journal Broadcast Group of KS Inc.*, 305 Kan. 761, 770, 388 P.3d 84 (2017); *Klepper v. Stover*, 193 Kan. 219, 222, 392 P.2d 957 (1964). This court accordingly reviews the lower court's factual findings supporting application of the doctrine for substantial competent evidence. *Mutual Life Ins. Co. of New York v.*

36

*Bernasek*, 235 Kan. 726, 730, 682 P.2d 667 (1984). In doing so, this court does not reweigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact. *Geer v. Eby*, 309 Kan. 182, 191, 432 P.3d 1001 (2019) (quoting *LSF Franchise REO I, LLC v. Emporia Restaurants, Inc.*, 283 Kan. 13, 19, 152 P.3d 34 [2007]).

On review, OPIK argues the panel erred in affirming the district court and determining the equitable estoppel doctrine applied to bar its statute of limitation defense as to the improper conservation fee deductions taken from royalties between January 1996 and July 2006. In applying the rule, OPIK asserts the panel stretched the equitable estoppel doctrine beyond its limits, and instead conflated the rule with the discovery accrual rule applicable in fraud cases. See, e.g., K.S.A. 60-513(a)(3) (providing that action for fraud "shall not be deemed to have accrued until the fraud is discovered").

A party asserting equitable estoppel has the burden to prove:

> "[A]nother party, by acts, representations, admissions, or silence when that other party had a duty to speak, induced the party asserting estoppel to believe certain facts existed. The party asserting estoppel must also show that the party reasonably relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts." *Owen Lumber Co.*, 283 Kan. at 927.

The moving party cannot argue equitable estoppel exists if it has not sufficiently established each of the above elements. Furthermore, that party will not prevail when the facts are ambiguous or subject to multiple constructions. *Steckline Communications, Inc.*, 305 Kan. at 770.

To determine whether the doctrine applies, courts must look at the facts and circumstances of each case and should not apply it in a formulaic manner. *Steckline Communications, Inc.*, 305 Kan. at 770. Our court also has made clear a party invoking the doctrine need not show the other party intended to deceive, defraud, or mislead the

37

moving party. Rather, the moving party need only show there was misrepresentation and that the party detrimentally relied on that misrepresentation. *Mutual Life Ins. Co. of New York*, 235 Kan. at 730.

The equitable estoppel rule is designed to prevent parties, both at law and in equity, from asserting certain rights against another person who detrimentally relies on the actor's deceitful conduct. *Gillespie v. Seymour,* 250 Kan. 123, 129-30, 823 P.2d 782 (1991). Indeed, this court has recognized that parties may be estopped from asserting a statute of limitations defense when the moving party establishes a misrepresentation existed and the moving party detrimentally relied on it. See *Bowen v. Westerhaus*, 224 Kan. 42, 45-46, 48, 578 P.2d 1102 (1978). The idea is that the misrepresentation lulled the plaintiff into a false sense of security that prevented the plaintiff from timely suing. See *Klepper*, 193 Kan. at 222.

In its cross-petition for review, OPIK claims the panel improperly conflated the doctrine of equitable estoppel with the discovery accrual rule in affirming the district court's findings. OPIK makes three general arguments: (1) the Court of Appeals relaxed the reliance element too much in this case; (2) it strayed from the doctrine when discussing the effects of OPIK's actions; and (3) it relied on its own holding in *Dunn v. Dunn*, 47 Kan. App. 2d 619, 281 P.3d 540 (2012), and then failed to follow that holding. As explained below, we find OPIK's arguments unpersuasive.

OPIK first claims the panel relaxed the detrimental reliance element too much. It notes both the panel and the district court determined that the Class members demonstrated detrimental reliance on OPIK's misrepresentation by cashing the monthly royalty checks without questioning the deductions. For context, the panel framed the district court's finding this way:

38

> "The [district] court found the reliance was reasonable because the royalty owners were not given any information on what taxes were owed, OPIK represented that the check stubs were truthful and accurate, and not even OPIK could easily tell what was in the state tax deduction. This finding makes sense. How are royalty owners going to reasonably question a deduction that is not even listed on the information given them? It was simply lumped in with another deduction for state taxes." *Fawcett II*, 58 Kan. App. 2d at 874-75.

OPIK argues the fact Class members continued to cash their royalty checks did not amount to sufficient detrimental reliance—their actions were the same both before and after they learned of OPIK's misrepresentations on the check stubs. OPIK also states that Class members had the ability to question the deductions and never did. If Class members contacted OPIK to ask about the deductions, OPIK claims it would have been able to provide them with more information. But OPIK's claim seeks to ask this court to reweigh conflicting evidence on appeal—and as noted above, this court does not do that. *Geer*, 309 Kan. at 191.

Next, OPIK claims the panel failed to actually apply the equitable estoppel doctrine in reaching its conclusion that OPIK could not assert a statute of limitations defense. Here, the parties agree the Class did not know about the unlawful deductions until 2011 (following this court's decision in *Hockett*), which is when the Class originally sued. The Class representative declared he relied on the accuracy of the check stubs in accepting the propriety of the deductions taken. He did not suspect the "taxes" being deducted were not really taxes. He also stated that had he known about the improper deductions before, he would have acted sooner. OPIK engaged in the practice of deducting these fees as taxes from January 1996 to October 2015.

Even after this court in *Hockett* ruled in 2011 that it was improper for operators to do so, OPIK does not dispute that it continued to do so for another four years. So this is not just a matter of estopping OPIK from maintaining that the check stubs were truthful

and accurate. Rather, it is about preventing OPIK from cutting off its liability at a certain point after having made affirmative misrepresentations that deterred the Class members from pursuing timely legal action.

Finally, OPIK argues the panel relied on its holding in *Dunn* and then failed to follow that holding. The panel held the Class did not have to prove an intent to deceive to prevail on its equitable estoppel claim—but as OPIK asserts, *Dunn makes clear that* this is exactly what the Class had to do to meet its burden. OPIK claims this is where the panel's application most conflates the discovery accrual rule. In fact, OPIK notes the panel says OPIK "concealed the conservation fee deduction. Thus, no Class member could have timely discovered their claims." *Fawcett II*, 58 Kan. App. 2d at 875.

There are several flaws with OPIK's argument. First, *Dunn* was a case in which the equitable estoppel doctrine was applied based on a defendant's silence. In those cases, plaintiffs have the added burden of proving the defendant had a duty to speak. And because plaintiffs must prove that duty, as a corollary, they also must prove the defendant had an intent to deceive or a reason to believe others would be deceived in detrimentally relying on that silence. See 47 Kan. App. 2d at 639. The panel simply used *Dunn* to explain the burden in equitable estoppel cases when a defendant is silent. Otherwise, it simply referred to *Dunn* in stating various equitable estoppel rules. See *Fawcett II*, 58 Kan. App. 2d at 873-74. There is no evidence the panel relied on *Dunn*'s core holding in reaching its conclusion. And *Dunn* is clearly distinguishable. The Class never alleged equitable estoppel based on silence in this case. As a result, it did not have to prove OPIK's intent to deceive. *Mutual Life Ins. Co. of New York*, 235 Kan. at 730. Both the district court and the panel found OPIK's concealment of the conservation fees amounted to affirmative *misrepresentations*—an act or representation that induced the Class members to rely on the truth and accuracy of the stubs. OPIK never challenged that ruling, and it cannot do so now on review.

40

As to the panel's statement about "timely discover[y]," we do not find this to be conclusive support for the proposition that the panel conflated the equitable estoppel rule with the discovery accrual rule. Rather, it is just an explanation as to why equitable estoppel is applied here to bar a statute of limitations defense. In other words, OPIK's continual affirmative misrepresentations induced the Class members to believe OPIK was lawfully deducting state "taxes" from their royalty payments when it was not. This application of the rule relies not on discovery of the misrepresentation but on the fact that the misrepresentation deterred action at an earlier time. The panel applied the doctrine correctly here.

CONCLUSION

In *Fawcett I*, this court held that under the leases at issue, OPIK satisfied its duty to market the gas when the gas was sold at the wellhead. 302 Kan. at 365. The law of the case doctrine precludes the Class from relitigating its claim that OPIK breached its implied duty of good faith in the marketable condition component of the duty to market. As a result, the district court's decisions to deny the Class' motion to amend its petition and to grant OPIK's renewed motion for summary judgment are affirmed.

The Class is not entitled to prejudgment interest under K.S.A. 16-201 or K.S.A. 55-1615 because the parties' stipulated award for damages did not become liquidated until they entered into the stipulation. In reaching this holding, we specifically decline to decide which statute would have determined the amount of prejudgment interest for the royalty underpayments in this case. So to the extent the district court and the Court of Appeals denied prejudgment interest after holding—as a matter of law—that K.S.A. 55-1615 controlled, we vacate those holdings and affirm the decisions as right for the wrong reason.

41

The district court and panel appropriately applied the equitable estoppel doctrine to bar OPIK's statute of limitations defense to the Class' claim that OPIK improperly deducted conservation fees from its royalty payments.

Affirmed.